IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

COMMUNITY PRESCHOOL & NURSERY
OF EAST LIBERTY, LLC

               09cv0979

    Plaintiff,        **ELECTRONICALLY FILED**

  v.

TRI-STATE REALTY, INC.,

    Defendant.

### MEMORANDUM OPINION RE: DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT (DOC. NO. 54)

**I. Introduction and Background**

**A. Introduction**

At issue in this case is what caused the fire at a building owned by defendant, the first floor of which was leased to plaintiff to use as a child-care facility, and the allocation of risks set forth in their Lease Agreement. Because the record is inconclusive as to the cause of the fire and is conclusive that defendant did not breach the Lease Agreement when it terminated the lease following the fire, pursuant to the terms of said agreement, the Court will grant summary judgment for defendant on plaintiff's negligence and breach of contract claims under Pennsylvania common law.

**B. Procedural History**

Plaintiff Community Preschool & Nursery of East Liberty ("Community Preschool") is a limited liability company that provides a preschool service for young children in Pittsburgh, Pennsylvania. Defendant Tri-State Reality, Inc. ("Tri-State") is a real estate company with its

principle place of business in Highland Heights, Ohio.

Asserting diversity jurisdiction pursuant to 28 U.S.C.§ 1332, Community Preschool filed a complaint on July 28, 2009, under Pennsylvania common law alleging that defendant was at fault for a fire at plaintiff's place of business and for damages it incurred as a result thereof, seeking punitive and compensatory damages. Community Preschool's initial complaint raised four causes of action[1] namely negligence, negligence per se, intentional trespass and breach of contract. Essentially, the complaint asserted that after Community Preschool had made substantial improvements to the first floor of the building, including new electrical wiring, and occupied the leased premises on a seven year lease, Tri-State rented the second floor of the building to tenants, even though Tri-State had not procured an occupancy permit for the second floor.

Moreover, plaintiff claims that the second floor tenants experienced problems with the electrical service in the second floor, which contained electrical wiring of unknown origin that was not of commercial quality and "was not up to current building code standards and/or was in need of complete replacement," and that Tri-State leased the second floor when it knew or should have known that the electrical wiring throughout the second floor was "not commercial in nature, was sheathed cable or Romex, and/or [was] not up to current building code standards and was in need of complete replacement." Complaint, (Doc. No. 1) at ¶¶ 24-26.

On July 17, 2008, at approximately 8:30 pm, a fire started on the second floor in the ceiling above the space leased and occupied by The Adolescence Preparing 4 Excellence

---

[1] The parties apparently agree that Pennsylvania's common law applies to this diversity case, and this Court agrees with their assessment.

("APEX") of Pittsburgh, and a City of Pittsburgh fire investigation report attached to the Complaint indicates that the origin of the fire was "an electrical arc caused by faulty wiring in the ceiling" of the APEX office. Complaint, (Doc. No. 1) at ¶¶ 28 and 29. Plaintiff avers that the second floor was destroyed by fire, that the first floor leased premises "was rendered unsuitable for use as a daycare center due to extensive smoke and water damage," and that plaintiff was forced to vacate the premises and discontinue the operation of its business at that location. Complaint, (Doc. No. 1) at ¶¶ 32 and 33.

Plaintiff further claims that Tri-State knew or should have known that "occupancy of the second floor of the Building was in violation of the Building Code of the City of Pittsburgh on the basis that the Certificate of Occupancy strictly prohibited occupancy on the second floor of the Building and clearly indicated that the second floor was to remain vacant," that it knew or should have known occupancy of the second floor "created an unreasonable risk of fire as a result of the dangerous condition of the electric wiring throughout the entire second floor," and that Tri-State was "charged with a high degree of care with regard to occupancy on the second floor of the Building, knowing that the first floor of the Building was occupied by up to 60 pre-school children (ages 2 ½ and older) and 40 infants" each day of the work week. Complaint, (Doc. No. 1) at ¶¶ 35-37.

Tri-State filed a Partial Motion to Dismiss plaintiff's claims for negligence per se and for trespass at Counts II and III with prejudice. Plaintiff agreed that negligence per se is not a separate cause of action In Pennsylvania, and the Court dismissed Count II. Although plaintiff disputed Tri-State's argument that it failed to state a claim for trespass, the Court agreed with defendant and dismissed Count III with prejudice. Memorandum Order, October 6, 2009, (Doc.

No. 20) at 5-7.

On October 10, 2009, plaintiff filed an amended complaint, defendant answered, and discovery took place. On April 28, 2010, defendant filed a motion for summary judgment arguing that plaintiff cannot establish essential elements of its negligence cause of action or that defendant breached the Lease Agreement.

### C.  Statement of Facts

Community Preschool and Tri-State entered into their Lease Agreement on December 31, 2003. The Lease Agreement stipulated that Community Preschool would lease the bottom floor of a two-story commercial office building located in Pittsburgh, Pennsylvania. The term of the Lease Agreement was seven years with a renewal option of another seven years. Community Preschool intended to use the property to operate a child-care facility.

Two crucial provisions of the lease are the express warranty of quiet enjoyment and the fire and casualty provision. The quiet enjoyment provision states:

> By paying the rent and observing all agreements, terms and conditions herein, Tenant shall peaceably and quietly have, hold and enjoy the Premises during the term of this lease and any extension or renewal, subject to the provisions hereof.

Lease Agreement, (Doc. No. 24-1) at ¶ 16.

The fire and casualty provision states:

> In the event the Premises or the building containing the Premises are partially damaged by fire or other casualty so as to render the Premises unsuitable for use for which the same are leased, rent will be abated until Landlord shall have restored the same to substantially their former condition. Provided, however, that if landlord elects not to repair such damage, or if such repairs shall not have been completed within 270 days, either party may terminate this lease and rent will be apportioned as of the date of termination.

Lease Agreement, (Doc. No. 24-1) at ¶ 21.

On June 30, 2004, after the Lease Agreement was signed but before Community Preschool occupied the first floor of the building, Tri-State received a Certificate of Occupancy from the City of Pittsburgh Bureau of Building Inspection for the first floor of the two story building. The same Certificate of Occupancy also stated "2nd floor to remain vacant." Certificate of Occupancy, Plaintiff's Concise Statement of Material Facts, (Doc. No. 63) at ¶ 27 and Appendix 4.

On April 1, 2007, Tri-State leased out part of the second floor of the building to APEX for a five-year period. On October 5, 2007, Tri-State leased out another part of the second floor to a Pennsylvania State Representative for a two-year period. Tri-State did not receive a Certificate of Occupancy from the City of Pittsburgh for use of the second floor and Tri-State did not get the electrical system inspected before allowing these occupants to use the premises.

On April 23, 2007, an APEX employee complained to Tri-State about electrical outlets not working. Tri-State responded to this complaint by stating "I do not believe there are any problems with the meter because our electrician organized and updated all of the wiring and meters in the building when the preschool moved in." Plaintiff's Supplemental Opposition Papers, (Doc. No. 66) at ¶ 5. On July 17, 2008, the fire that started in the second floor overtook the two story building and damaged Community Preschool's property and rendered it unusable to run its business.

City of Pittsburgh Fire Department investigative reports at the time of the incident and subsequent expert opinions were consistent in locating the start of the fire in the electrical wiring above the office space of an APEX employee, on the second floor. The various experts agreed the fire started in that area with an electrical malfunction, but no one ventured an opinion about

the actual cause of the malfunction.  Defendant's expert witnesses, Eugene W. Bartel, Ph.D., P.E., C.F.I. & B.C.F.E. and Aaron T. Bartel, Eng. & E.I.T. of Bartel & Associates, reviewed the reports of Detectives Michael Burns and Bryan Marrone, photographs that were taken at the scene of the fire, the Amended Complaint, and other reports and investigations, and asserted that regardless of whether anyone was on the second floor, the faulty wiring would have been in use for heating, ventilation, and air conditioning of whole the building. Investigation Report by Bartel & Associates, (Doc. No. 59) at 10.

On April 27, 2009, Tri-State sent a letter to Community Preschool asserting Tri-State's intention to terminate the lease pursuant to the fire and casualty provision of the Lease Agreement.  On July 28, 2009, Community Preschool filed this lawsuit against Tri-State.

After careful review of defendant's Motion for Summary Judgment, the briefs in support and in opposition, the statement of material facts and the counter statement, and the supporting documents and deposition testimony, the Court finds, as a matter of law based upon undisputed material facts, that plaintiff cannot meet its burden of proving an essential element of its negligence claim, i.e., that defendant's breach of duty caused the fire and damages, nor can it show that defendant breached the Lease Agreement.  Because a reasonable jury could not find otherwise on the record before the Court, the Court will grant the motion for summary judgment for defendant on plaintiff's negligence and contract claims, for the reasons to follow.

**II.     Legal principles**

**A.      Standard for Summary Judgment**

Fed.R.Civ.P. 56(c)(2) currently provides that on a motion for summary judgment, the "judgment sought should be rendered if the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." "Rule 56 of the Federal Rules of Civil Procedure 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Summary judgment is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Woodside v. Sch. Dist. of Philadelphia Bd. of Educ.*, 248 F.3d 129, 130 (3d Cir. 2001) (quoting *Foehl v. United States*, 238 F.3d 474, 477 (3d Cir. 2001) (citations omitted)).

An issue of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); see also *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof.") (citing *Anderson* and *Celotex Corp.*) Recently, the United States Supreme Court "emphasized, [w]hen the moving party has carried its burden under Rule 56©, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372 (2007) (internal quotations omitted)

(quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986)).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to, draw all reasonable inferences, and Resolve all doubts, in favor of the nonmoving party. *Doe v. County of Centre, PA*, 242 F.3d 437, 446 (3d Cir. 2001); *Woodside*, 248 F.3d at 130; *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 151 (3d Cir. 1999). Further, a court must not engage in credibility determinations at the summary judgment stage. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n. 3 (3d Cir. 1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994)).

**B.      Common Law Negligence**

To establish a negligence claim under Pennsylvania common law, the injured party must prove each of the following elements: "(1) [a] duty or obligation recognized by the law that requires an actor to conform his actions to a standard of conduct for the protection of others against unreasonable risks, (2) failure on the part of the defendant to conform to that standard of conduct [*i.e.,* a breach of duty], (3) a reasonably close causal connection between the breach of duty and the injury sustained, and (4) actual loss or damages that result from the breach." *Gutteridge v. A.P. Green Services*, 804 A.2d 643, 654 (Pa. Super. 2002), *see also, Morena v. South Hills Health System*, 462 A.2d. 680, 684 n.5 (Pa. 1983) (citing Prosser, Law of Torts § 30, at 143(4th ed. 1971)); *Kleinknecht v. Gettysburg College*, 989 F.2d 1360, 1366 (3d Cir. 1993). There is no dispute that Tri-State had a duty to plaintiff, as its landlord, and that damages to plaintiff's property and business have resulted. There is a dispute and a genuine issue as to whether Tri-State actually breached any duty. This dispute, although genuine, is not material because the dispositive issue on summary judgment is the third element regarding causation. The

plaintiff cannot prove, on the evidence proffered on the summary judgment record, that Tri-State's breach of duty was the proximate cause of the fire.

To determine whether any breach of duty proximately caused plaintiff's damages, the Court looks to whether a reasonable person would infer that the injury was the natural and probable result of defendant's breach of duty. *Commerce Bank v. First Union Nat. Bank*, 911 A.2d 133, 142 (Pa. Super. 2006). In *Remy v. Mentz*, a case dealing with a fire caused by a tenant placing foam too close to hot light bulbs, a fire was determined to be the natural and probable result of the conduct because there was evidence that (1) the foam placed near the lightbulb was the source of the fire and (2) the defendant placed the foam there. 571 A.2d 446, 449 (Pa. Super. 1990).

Additionally, in *Northeast Controls v. Fisher Controls Intern.*, a case involving an explosion that was allegedly caused by a manufacturer giving faulty instructions to a buyer, The United States Court of Appeals for the Third Circuit found evidence that an explosion was the natural and probable result of defendant's negligence. 2010 WL 1257712, *1 (3d Cir. 2010)[2]. The Court of Appeals determined that evidence showed that (1) the faulty valves caused the explosion and (2) the valves were faulty due to defendant's conduct in regards to the incorrect instructions, establishing causation. *Id.* at *3.

On the contrary, in *Investors Real Estate Trust Properties, Inc.*, an owner of an apartment failed to present affirmative evidence that a contractor negligently caused a fire when the cause

---

[2] Though the Court of Appeals in *Northeast Controls* applied Delaware law, the analysis for causation is similar in Pennsylvania and Delaware. Compare *Commerce Bank*, 911 A.2d at 142 ("[A] plaintiff must show that the causation was of a type that reasonable people would consider fair, natural, and probable") with *Russell v. K-Mart Corp.*, 761 A.2d 1, 4 (Del. 2000) ("In Delaware, proximate cause is one which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred") (citation omitted).

of the fire could not be determined. 686 N.W. 2d. 140, 142-43 (N.D. 2004). The court noted that "[t]he plaintiff may not choose a few possible causes, attempt to disprove them and on that basis alone claim that one other possible cause has been established by the proximate cause." *Id*. at 145.

1. **Community Preschool's Negligence Allegations**

Community Preschool alleges that defendant had a duty to Tri-State, that Tri-State breached that duty by failing to obtain a Certificate of Occupancy for the second floor and by allowing tenants to occupy the second floor, that the breach caused the fire, and that the fire caused damages. Specifically plaintiff asserts:

> At all times relevant and material hereto, Defendant knew or should have known that occupancy of the second floor without obtaining all necessary governmental approvals, including an electrical inspection from the City of Pittsburgh and a Certificate of Occupancy, prior to occupancy of the second floor of the building, would likely lead to an electrical fire due to the condition of the wiring throughout the second floor which was of unknown origin, was not commercial in nature, was sheathed cable or Romex and/or not up to current building code standards and was in need of complete replacement.

Amended Complaint, (Doc. No. 24) at ¶ 57.

Tri-State admits it had a duty and that damages resulted from the fire. Although Tri-State disputes whether it breached its duty to Community Preschool by leasing the second floor without a Certificate of Occupancy, such dispute is not material because, assuming that was a breach of duty, there is no evidence on record to support causation of the fire, an *essential* element of plaintiff's negligence claim.

On the causation issue, the opinions of two fire investigators and two experts were largely consistent with one another. Detective Bryan Marrone, of the City of Pittsburgh Bureau of Fire,

investigated the scene on the night of the fire and stated in his deposition that the cause of the fire was an "electrical malfunction." Plaintiff's Concise Statement of Facts, (Doc. No. 63) at 6-7. When asked what he meant by "electrical malfunction," Marrone stated, "[a]n arc usually, but it could be - - an overheated wire is an electrical malfunction. If you have your coffee maker on and the timer malfunction, its [sic] an electrical malfunction, just for example." *Id*. at 7.

Detective Michael Burns of the Pittsburgh Police Department, who also investigated the scene on the night of the fire, asserted in his deposition that;

> [the cause of the wire malfunction] could be a lot of different things. It could have been a nick in it from when they installed it. It could have had too much power to it. It could have come in contact with something up in the ceiling that could have energized it or caused something else to become energized. There's lots of things that could have happened. . . . I've had incidents where there was a power surge or Duquesne Light hooked buildings up wrong, and the building got too much power to it, and it blew out circuits, electrical circuits, and the wiring and caused fires because it had too much power to it, and there was a surge.

Defendant's Concise Statement of Facts, (Doc. No. 55) at 3-4.

Defendant's experts reviewed the reports of Detectives Burns and Marrone, photographs that were taken at the scene of the fire, the Amended Complaint, and other reports and investigations, and asserted that;

> [s]ince there are no other potential sources of ignition in this area, with the exception of electrical wiring, this fire was caused by some electrical fault. . . . Electrical faults can occur from accidental causes and without any prior indication these faults are about to occur. The faults can be as a result of a defect in the wiring or in its installation that provided no outward sign of the defect. Even if an inspection had taken place of these wires, there is no guarantee that such an inspection would have detected a potential fault and in fact, this potential fault area may have not even been evident when the inspection took place.

Investigation Report by Bartel & Associates, (Doc. No. 59) at 10.

Plaintiff's expert, Dr. Bert Davis, P.E., C.F.E.I., also reviewed the reports of Detectives Burns and Marrone, the Amended Complaint, and photographs that were taken at the scene of the fire, and opined that;

> [t]he Pittsburgh Fire and Arson Investigative Department concluded that the fire was electrical in origin because they ruled out all other sources except for electrical. This conclusion is *technically plausible* given that no other sources of ignition were found. *A possible fire scenario* would have been from arcing at non-metallic wiring attached to a wood stud. *It is possible* for an over driven staple, or some other damage to this type of wiring, to initiate an arcing event that can lead to a fire. This was the primary reason that arc fault circuit interrupter circuit breakers were developed and required in homes. Homes are normally constructed of lumber and are wired with non-metallic sheathed cable.
> The occupancy permit issued for the day care center lists an alteration in the building occupancy (originally retail and office space) for its use as a day care center. It is likely that the second floor of the building was required to be unoccupied because of this change of use. The change of use may have required the inclusion of a building sprinkler system, or other changes to the building to permit occupancy of the second floor. *Leaving the second floor unoccupied would have decreased the probability of fire* from plugged in equipment, lighting, etc., *and it would have decreased the fuel load* from furniture, files and equipment. The combustion of these items greatly increases the duration and intensity of a fire in a non-combustible or limited combustible structure.

Davis Affidavit, (Doc. No. 64-1) at 158-59 (emphasis added).

All of the experts agreed, therefore, that the cause of the fire was probably an electrical malfunction. Additionally, none of the experts gave an opinion regarding the specific cause of the electrical malfunction. That is, the experts described possibilities of what may have been the problem with the wiring, but none could say for certain what caused the electrical malfunction. There is some uncertainty as to the exact cause in-fact of the electrical fire, but that factual dispute, although genuine, is not material because there is *no evidence* that Tri-State's alleged breach of duty was the proximate cause of the fire, leaving a gapping hole in the causal chain.

-12-

In *Northeast Controls*, there was direct evidence showing that the cause of the explosion was the faulty valves and the faulty valves were caused by the defendant's breach of duty. By contrast, Community Preschool does not connect Tri-State's alleged breach to the fire in any way. Community Preschool only offers evidence suggesting that the wiring in the ceiling was the cause of the fire, not that Tri-State's leasing the second floor to tenants without a Certification of Occupancy (the breach of duty alleged) created faulty wiring or an electrical fire.

In *Remy,* the Court found that evidence of the defendant placing the foam against the lightbulb was sufficient to prove that the foam catching fire was the natural and probable cause of the act, in the absence of any evidence that might support another cause. Here, there is no evidence supporting plaintiff's claim that Tri-State's conduct caused the fire because there is no evidence of what actually caused any wiring to go bad. Indeed, even plaintiff's expert opined only in terms of possibilities, to-wit: "[a] *possible* fire scenario would have been from arcing at non-metallic wiring attached to a wood stud. It is *possible* for an over driven staple, or some other damage to this type of wiring, to initiate an arcing event that can lead to a fire." Davis Affidavit, (Doc. No. 64-1) at 158-59 (emphasis added).

Community Preschool claims that the defendant caused the faulty wires to ignite because, "but-for" the defendant allowing others to occupy the second floor, the fire would not have happened. In Pennsylvania, however, "'but-for' causation is not sufficient . . . [A] plaintiff must show that the causation was of a type that reasonable people would consider fair, natural, and probable." *Commerce Bank*, 911 A.2d at 142. Regardless of whether "but-for" causation applies, Community Preschool's assertion is still unfounded because the faulty electric wire would be in

use to maintain the buildings lighting, heating, ventilating and air-conditioning system whether or not it had been occupied. Defendant's expert stated:

> [S]ince the exact electrical fault that caused this fire can not be determined, even the disconnection of electrical power from the second floor office area may not have prevented this fire since HVAC electrical wiring ran through the second floor ceiling area to the various units located on the roof top of the structure.

Investigation Report by Bartel & Associates, (Doc. No. 59) at 10.

Community Preschool's evidence that the second floor was occupied without a Certificate of Occupancy with inadequate or non-existent inspection procedures, proves the existence of conditions that *could have* affected the chances of a fire occurring. However, Community Preschool offers no evidence that would allow the jury to reasonably conclude that Tri-State's alleged breach *actually* caused the fire.

### 2.     Res Ipsa Loquitur

Plaintiff also asserts that the doctrine of res ipsa loquitur ("the thing speaks for itself") is sufficient to establish causation.[3] Res ipsa loquitur applies when "'there is no direct evidence to show cause of injury, and the circumstantial evidence indicates that the negligence of the defendant is the most plausible explanation for the injury. . .'" *D'Ardenne v. Strawbridge & Clothier*, 712 A.2d 318, 321 (Pa. Super. 1998) (quoting *Prosser & Keeton on the Law of Torts* § 40, at 257 (5th ed. 1984) (quoting *Roark v. St. Paul Fire & Marine Ins. Co.*, 415 So. 2d 295, 299 (La. App. 1982))). The doctrine provides the following:

> (1) It may be inferred that harm suffered by the plaintiff is caused by negligence of the defendant when

---

[3] Plaintiff discusses res ipsa loquitur and the doctrine of exclusive control, which are similar theories of proof of causation.

-14-

> (a) the event is of a kind which ordinarily does not occur in the absence of negligence;
>
> (b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and
>
> © the indicated negligence is within the scope of the defendant's duty to the plaintiff.
>
> (2) It is the function of the court to determine whether the inference may reasonably be drawn by the jury, or whether it must necessarily be drawn.
>
> (3) It is the function of the jury to determine whether the inference is to be drawn in any case where different conclusions may reasonably be reached.

*Gilbert v. Korvette, Inc.*, 327 A.2d 94, 100 (Pa. 1974) (quoting *Restatement (second) of Torts* § 328D (1965)).

Furthermore, regarding the causes of fire and res ipsa loquitur, it has been stated as follows:

> fire of unknown origin is one of many accidents that as a matter of common knowledge frequently occurs without anyone's fault, the rule of res ipsa loquitur is generally given only limited application in such cases and cannot be applied where expert opinion is unable to so pinpoint the cause of the fire in question as to exclude causation without fault of the defendant, at least to a strong degree of probability.

3 Summ. Pa. Jur. 2d Torts § 31:36 (2010) (citing *Lanza v. Poretti*, 537 F. Supp. 777 (E.D. Pa. 1982)).

In *Lanza*, a case involving a fire of which the cause was not precisely identified, the Court determined that res ipsa loquitur did not apply because "one of several sources might have caused the fire" and "the purpose underlying the doctrine would not be furthered by its application." *Lanza*, 537 F. Supp. at 788. In the *Lanza* case, plaintiff alleged that a misplaced cigarette or an intentional arson caused damage to her property. *Id*. at 780. The Court found that

"since a fire of unknown origin is one of many accidents that as a matter of common knowledge frequently occur without anyone's fault, the rule of res ipsa loquitur is generally given limited application." *Id*. at 787. *See also Walker v. Parish Chemical Co.*, 914 P.2d 1157, 1161 n. 2 (Ut. App. 1996) ("Courts uniformly have held the doctrine of res ipsa loquitur does not apply to fires whose specific origins remain unknown and unestablished by the plaintiff"); *Bond v. California Compensation and Fire Co.* 963 S.W. 2d 692 (Mo. Ct. App. 1998) (plaintiff asserted that a different method of clearing a burned building would have led to less damage; the Court found the assertion "speculation and conjecture" and res ipsa loquitur does not apply); *Presumption as to Negligence, Generally–Res ipsa Loquitur*, 35A Am. Jur. 2d Fires § 59 (2d Ed. 2010) ("As a general rule, application of the res ipsa loquitur doctrine in an action for fire-related damages requires that the actual cause or source of the fire was under the exclusive control of the party charged with negligence. . .") (citing *Northwestern Mut. Fire Ass'n v. Allain*, 49 A.L.R. 2d 362 (La. 1954)).

Here, the experts concluded that multiple causes of the fire were possible. For instance, Detective Michael Burns stated that the issue could have been a power surge, an incorrect hook up by Duquesne Light or something coming in contact with the wire in the ceiling. Defense's Concise Statement of Facts, (Doc. No. 55) at 3-4. Furthermore, plaintiff's expert noted that there were many possible scenario's including an over driven staple or arcing at non-metallic wiring attached to a wood stud. Davis Affidavit, (Doc. No. 64-1) at 158-59.

Community Preschool offers no expert or lay opinion that would allow the jury to find that the cause of the electrical malfunction was Tri-State's breach of duty. Every expert that opined on the cause of the electrical malfunction noted that the source of the electrical

malfunction was unknown. Therefore, because plaintiff failed to offer evidence regarding the specific cause and because other responsible causes cannot be eliminated by the evidence, res ipsa loquitur doctrine does not establish the requisite causation.

Since Community Preschool has insufficient evidence to support causation of the fire, either through res ipsa loquitur or through proximate cause, it cannot establish a necessary element of its cause of action. The motion for summary judgment will be granted in regards to the negligence claim.

### C. Breach of Contract

Community Preschool's second claim is that Tri-State breached the Lease Agreement in two ways: (1) the fire deprived it of its contractual right to quiet enjoyment and (2) the loss of the right to renew and continue the contract when defendant improperly terminated the contract. Under Pennsylvania common law, a cause of action for a breach of contract requires "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *CoreStates Bank* v. *Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. 1999). A lease is considered a contract and is "interpreted according to contract principles." *Mace v. Atlantic Refining & Marketing Corp.*, 785 A.2d 491, 496 (Pa. 2001).

The United States Court of Appeals for the Third Circuit noted that contract interpretation "is a question of law that requires the court to ascertain and give effect to the intent of the contracting parties as embodied in the written agreement. Courts assume that a contract's language is chosen carefully and that the parties are mindful of the meaning of the language used. When a writing is clear and unequivocal, its meaning must be determined by its contents alone."

*In re Old Summit Mfg.*, 523 F.3d 134, 137 (3d. Cir. 2008), (quoting *Dep't of Transp. v. Pa. Indus. for the Blind & Handicapped*, 886 A.2d 706, 711(Pa. Cmwlth. 2005)). In the absence of fraud, when the language of the contract is unambiguous, the Court is required to look to the writing itself and cannot diverge from the clear terms of the agreement. *Standard Venetian Blind Co. v. American Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983).

Here, two provisions are the focus of the dispute: the first is the express provision for the warranty of quiet enjoyment and the second is the provision regarding fire and casualty. Community Preschool asserts that Tri-State breached the warranty of quiet enjoyment when fire damaged Community Preschool's business and property. The express warranty of quiet enjoyment states:

> By paying the rent and observing all agreements, terms and conditions herein, Tenant shall peaceably and quietly have, hold and enjoy the Premises during the term of this lease and any extension or renewal, subject to the provisions hereof.

Lease Agreement, (Doc. No. 24-1) at ¶ 16.

In order to breach the warranty of quiet enjoyment, there has to be an act by the landlord that causes the breach. *Pollock v. Morelli*, 369 A.2d 458, 460 (Pa. Super. 1976) ("The covenant is between the landlord and his tenant and it is breached when a tenant's possession is impaired by acts of the lessor or those acting under him, or of the holder of a better title. . . . '[I]t is settled in this State that any wrongful act of the landlord which results in an interference of the tenant's possession, in whole or in part, is an eviction for which the landlord is liable in damages to the tenant.'" (quoting *Kelly v. Miller*, 94 A. 1055, 1056 (Pa. 1915)). Additionally, that act of the landlord must substantially impair the tenant's ability to use the property. *Property*, 8 Summ. Pa. Jur. 2d Property § 26:116 (2010) ("To constitute a breach, the impairment of the lessee's

possession need not be total, but the utility of the premises must be substantially decreased by the landlord's interference with a right or privilege that is necessary to the enjoyment of the premises") (citing *Jonnet Development Corp. v. Dietrich Industries, Inc.*, 463 A.2d 1026 (Pa. Super. 1983)).

Community Preschool cannot show Tri-State acted wrongfully regarding the alleged breach or caused the fire that burned the building. The act of leasing the second floor without obtaining a Certification of Occupancy did not breach the provision for quiet enjoyment because no impairment on plaintiff's ability to use and enjoy the property resulted. Additionally, plaintiff cannot establish that the fire was caused by an act of defendant. Moreover, the destruction of plaintiff's property and interruption of its business by a fire, which was not caused by Tri-State, triggered Tri-State's right under the fire and casualty provision to elect not to repair the premises and to instead terminate the Lease Agreement. Lease Agreement, (Doc. No. 24-1) at ¶ 21.

Community Preschool also alleges that Tri-State's decision to terminate was a breach of the Lease Agreement because it eliminated Community Preschool's right to renew the lease. Tri-State counters that Community Preschool breached the Lease Agreement because it did not obtain insurance as required by the Lease Agreement. The Court need not and does not decide whether Community Preschool's failure to obtain the required insurance amounted to a breach of contract, but notes that the Lease Agreement allocates the risk of a fire to the tenant, absent Tri-State's negligence or intentional conduct. *See* Lease Agreement, (Doc. No. 24-1) at ¶ 23 ("Unless caused by the negligence of Landlord, Landlord will not be liable for any loss, damage or theft of any property . . ."). The fire and casualty provision is also allocates the risk of fire to plaintiff. Lease Agreement, (Doc. No. 24-1) at ¶ 21.

Finally, plaintiff argues that even with provisions allocating risk, defendant is liable for damages resulting from the breach of contract because defendant negligently acted, causing a breach of contract. Plaintiff relies on the loss and damage provision, which states, "*[u]nless caused by the negligence of Landlord*, Landlord will not be liable for any loss, damage or theft of any property. . ." Lease Agreement, (Doc. No. 24-1) at ¶ 23 (emphasis added). For the reasons set forth in the preceding discussion of the negligence claim, Community Preschool cannot show that Tri-State's conduct was negligent, let alone intentional, in causing the fire. Thus, under the unambiguous provisions of the Lease Agreement, Tri-State had the right to terminate and the Court will grant summary judgment in defendant's favor on plaintiff's breach of contract claim.

### III.     Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment, (Doc. No. 54) pursuant to Federal Rule of Civil Procedure 56, will be **GRANTED** as to Counts I and II. An appropriate order follows.

**SO ORDERED** this 18th day of May, 2010

s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc:     All Registered ECF Counsel and Parties